TEXAS & N. O. R. CO. v. TILLMAN.*
(No. 195.)

(Court of Civil Appeals of Texas. Beaumont.
June 27, 1917. On Motion for Rehearing,
Oct. 31, 1917.)

1. CARRIERS ⊙═287(6) — PASSENGERS — DRO-
VER'S PASS—OPPORTUNITY TO BOARD CA-
BOOSE.

A railroad does not owe to one riding on a
drover's pass the duty of starting its caboose
from the depot platform, or furnishing light
for his accommodation and safety.

2. CARRIERS ⊙═318(8)—CUSTOMARY STOPPING
PLACE—EVIDENCE.

Testimony that, when a train is made up,
the engine always stands on the west side of
the street, and that the caboose in which plain-
tiff shipper was to take passage stood 36 car
lengths from the engine at the head of the train,
was insufficient to show that the train stood at
the usual or customary place where trains of
that character stand before starting.

3. CARRIERS ⊙═280(5)—ACCEPTANCE OF PAS-
SAGE ON FREIGHT TRAIN.

One who accepts passage on a freight train
accepts the consequent inconvenience of travel-
ing thereon.

4. CARRIERS ⊙═280(8)—DROVER'S PASS—OP-
PORTUNITY TO BOARD.

A carrier owes to the possessor of a drover's
pass a high degree of care in affording him a
reasonable opportunity to board the caboose
before the train leaves the town where the pass
is procured.

5. APPEAL AND ERROR ⊙═999(1)—FINDINGS
OF JURY—REVIEW.

A jury finding, supported by evidence, that
defendant carrier did not afford plaintiff shipper,
holding a drover's pass, a reasonable oppor-
tunity to board the caboose, is conclusive on ap-
peal.

6. CARRIERS ⊙═287(5)—SHIPPERS—OPPORTU-
NITY TO BOARD.

It is the duty of one holding a drover's pass
to present himself for passage at defendant's
caboose wherever it may be, but time should be
given him to get aboard or, if there is insuffi-
cient time, he should be so informed, and for-
warded by another train.

7. CARRIERS ⊙═283(4) — "PASSENGER" — IN-
SULTS BY EMPLOYÉS.

When the plaintiff obtained a drover's pass,
and walked out of the office where the pass was
issued to him, he was a passenger, and defend-
ant company became liable for the mortification
and humiliation he endured because of the pro-
fane and abusive language used toward him by
defendant's employés.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Passen-
ger.]

8. CARRIERS ⊙═318(8)—REASONABLE OPPOR-
TUNITY TO BOARD TRAIN—EVIDENCE.

Evidence held sufficient to support a jury
finding that defendant railroad did not afford
to plaintiff a reasonable opportunity to board the
train before it left the place where the drover's
pass was procured.

9. CARRIERS ⊙═318(11)—REASONABLE OPPOR-
TUNITY TO BOARD — SUFFICIENCY OF EVI-
DENCE.

Evidence held insufficient to show that de-
fendant railroad, in stopping near destination
called for in plaintiff's drover's pass, stopped
at the usual and customary place where such
trains stop.

10. CARRIERS ⊙═346(3)—CONTRIBUTORY NEG-
LIGENCE OF SHIPPER—SUFFICIENCY OF EVI-
DENCE.

In an action against a carrier, evidence held
insufficient to show that plaintiff shipper, rid-
ing on a drover's pass, was negligent as a mat-
ter of law in alighting from the moving train
as it slowly climbed a hill.

11. CARRIERS ⊙═333(3) — OPPORTUNITY TO
ALIGHT—DUTY OF CARRIER.

Where defendant railroad did not use proper
care to afford the possessor of a drover's pass
a reasonable opportunity to alight from the
caboose, he was not negligent in failing to get
off when the train stopped before reaching the
station, and remained a passenger to whom de-
fendant owed the same degree of care as for-
merly.

12. CARRIERS ⊙═346(3)—CONTRIBUTORY NEG-
LIGENCE OF SHIPPER—SUFFICIENCY OF EVI-
DENCE.

Evidence held sufficient to support a jury
finding that the possessor of a drover's pass
was not negligent in not getting off the train
when it stopped near the place called for by
his pass.

13. CARRIERS ⊙═280(8)—DUTY TO PASSENGER
—DROVER'S PASS.

Aside from the stipulation in a drover's pass
that the train shall not be required to stop or
start at or from depots or platforms, or furnish
light for his safety, a railroad owes such holder
that high degree of care which a very cautious
and prudent person would exercise under the
same or like circumstances.

14. CARRIERS ⊙═333(5) — ALIGHTING FROM
MOVING TRAIN — CONTRIBUTORY NEGLI-
GENCE.

In determining whether plaintiff was negli-
gent in alighting from a moving train, the ques-
tion is, "Did he exercise that degree of care
which an ordinarily careful person would under
the same or like circumstances?"

15. CARRIERS ⊙═319(3) — OPPORTUNITY TO
BOARD TRAIN—DAMAGES.

A jury finding of $333 as damages for a
severely bruised shoulder, for mental suffering
and worry caused by having to go a considera-
ble distance between box cars at night to get
to the caboose, and for humiliation caused by
abusive language of defendant railroad's em-
ployés, was warranted.

16. CARRIERS ⊙═319(3) — OPPORTUNITY TO
ALIGHT—DAMAGES.

A jury finding allowing plaintiff shipper
$666 as damages for injuries sustained in at-
tempting to alight from the caboose of a moving
train, resulting in a bruised hand, knee, side,
and head, for humiliation caused by abusive
language of defendant railroad's employés, and
for worry caused by having to walk back to the
station, a distance of three miles in the dark,
was not unwarranted.

Appeal from District Court, Liberty Coun-
ty; J. Llewellyn, Judge.

Action by R. N. Tillman against the Texas
& New Orleans Railroad Company. From a
judgment for plaintiff, and from an order
overruling motion for new trial, defendant
appeals. Affirmed.

Orgain, Butler & Bolinger, of Beaumont,
and Baker, Botts, Parker & Garwood, of
Houston, for appellant. E. B. Pickett, Jr.,
of Liberty, for appellee.

BROOKE, J. Plaintiff filed this suit on
January 25, 1915. It is alleged in the peti-
tion that about September 25, 1914, plaintiff

---

shipped from Glen Flora, in Wharton county, Tex., a car of live stock containing 12 head of mules and 2 horses; that the stock was loaded at Glen Flora about 11 o'clock a. m. on September 25, 1914, and that plaintiff was en route to Liberty with his said stock, accompanying the shipment upon a drover's pass, and that the route of the shipment was over the Gulf, Colorado & Santa Fé from Glen Flora to the town of Wharton, thence over the G. H. & S. A. to the city of Houston, and from there over the Texas & New Orleans to Liberty; that after the car was loaded, about 11 o'clock in the morning, it was promptly carried to Wharton, and left Wharton about 4 p. m. on the same day for Houston, arriving at Houston at about 12 midnight; that after reaching Houston it was necessary for plaintiff to change from the caboose in which he had ridden from Wharton, and become a passenger upon the train of defendant in which his said car of stock was to be hauled from Houston to Liberty, and that the conductor who was in charge of the train that brought the plaintiff from Wharton to Houston pointed out to the plaintiff the office of the agent of defendant at Houston from whom plaintiff was to obtain a drover's pass that would entitle him to transportation from Houston to Liberty upon the train which was to haul his car of stock, and that plaintiff was informed also that he could find out from said agent at Houston where he might find the caboose in which he was to ride from Houston to Liberty; that shortly after arriving at Houston the said conductor showed him the office of the defendant in Houston, and also made known to him the agent who was in charge thereof, and that the agent of the defendant company did issue to plaintiff a drover's pass entitling him to transportation from Houston to Liberty, and that while he was in said office of said agent he inquired of him where he could find the caboose in which he should ride; that the said agent pointed out to the plaintiff the conductor who was in charge of the train on which plaintiff was to come to Liberty, and which was to haul his stock, and that the plaintiff approached said conductor and inquired of him where the caboose was, and if his train would stop so that the caboose would be at all near the office or station where plaintiff then was, so plaintiff might board said caboose, and it is alleged that that inquiry was answered by the conductor very roughly and angrily, and that, using a vile oath, said the train would not stop near that station or depot, but that the train would run by that station and not stop until it reached another yard about one or one and one-half miles distant, and that plaintiff could follow on behind the train and get on the caboose when it stopped out there, or he could get on a box car and ride out there and then alight and board the caboose when the train stopped in said yard; that thereupon plaintiff informed said conductor that he was

sick and could not and would not so ride on a box car or follow behind said train as the conductor had suggested, and then he asked said conductor how far it was from said depot or station back to the caboose of his train, and the conductor replied that it was 36 car lengths, and then plaintiff asked him if he (plaintiff) would have time to reach the caboose before the train would start, and the conductor, again very roughly and angrily and with vile oaths, replied that he did not know, but he might if he went fast enough, and also plaintiff asked him if he would have time to walk there, and the conductor made him the same manner of reply, telling plaintiff that he could run or walk, just as he pleased, that it made no difference to him whether he got there in time or not. It is further alleged that, after the conversation just set out between plaintiff and defendant's conductor, the plaintiff at once started in a brisk walk for said caboose, and in the course where the conductor told him he would find it, and that while so trying to reach said caboose before the train would start plaintiff was compelled to be between two strings of box cars, and the passageway was very rough, and, it being extremely dark, plaintiff stumbled over some obstruction in his pathway and was thrown against one of the cars near which he was walking, and his shoulder was thereby severely bruised, causing him to suffer much physical pain, discomfort, and mental worry; that also, while proceeding along this dark and rough passageway in search of said caboose, plaintiff was very uneasy, being wholly unacquainted with his surroundings, and fearful that he might be assaulted by some tramp or highwayman lounging around and about the railroad tracks and cars, thus causing him, on this account, to endure much anguish of mind; that just before reaching the caboose for which he was searching, as above alleged, the train started, but he managed to board the caboose as it passed him, and the train proceeded on to Liberty, arriving there at about 4:30 a. m. The petition then alleges that plaintiff was aware he was near Liberty when the train stopped about one mile west of the town, but at that time none of the trainmen was in the caboose with plaintiff, and the train started again before any of them returned to the caboose, but shortly after it started a brakeman upon the train came into the caboose, and plaintiff asked him if the train would stop at Liberty, and the brakeman answered with an oath, "No; we will not;" that when the train had gained much speed and was nearing the depot in the town of Liberty, and plaintiff pleaded with said brakeman to stop the said train that he might alight, plaintiff at the time telling the brakeman that he was sick and also that some of his family was sick, and it was very necessary for him to be at home, but the brakeman refused to stop said train, and told plaintiff that he would have to go on to Nome, which is a station in Jef-

ferson county, about 20 miles east of Liberty; that by this time the train had passed the depot in Liberty, and plaintiff continued to beg said brakeman to stop the train, but his repeated requests were refused, and said brakeman proposed to him that he jump off the train, and then the conductor, who was in charge of said train, returned to the caboose, and began to curse and abuse plaintiff, and told him he had better get off now, and that he could jump off, but plaintiff informed said conductor that he had never jumped off a train, and the conductor answered that if he did not jump off he would have to go on to Nome, but said conductor continued to urge plaintiff that he could jump off without being hurt, and then told him he would show him how to jump, and the conductor did thereupon get upon the steps of the caboose and indicate to plaintiff the manner in which he should jump from said caboose, and after being so urged and persuaded by said conductor to jump from said caboose, and relying upon his assurance that plaintiff could make the jump without danger or hurt, plaintiff at last yielded to such insistence and persuasions, and when near Ames, three miles east from Liberty, he attempted to jump from said caboose, but fell, and was thrown down a high embankment, and in the fall his left hand and arm were badly cut, scratched, and bruised, and his left knee was cut and bruised, and also, as a result of said fall, his body and limbs were bruised and made very stiff and sore for several weeks thereafter, and some of his ribs were bruised and contused, and even yet he feels pains about his side when doing work that requires his strength; that when plaintiff attempted to jump from said caboose it was still dark, and then it was necessary for him to walk back to Liberty, where he arrived about daylight. The petition further alleged that all of the injuries received by plaintiff, as above alleged, caused him to suffer much pain and discomfort, both physical and mental, and, in addition thereto, plaintiff endured great humiliation and mortification from the grossly offensive and abusive treatment he received from said conductor and brakeman of defendant, as above particularly alleged, in all to his actual damage in the sum of $2,500.

The case was submitted on special issues, and the following charge was given:

"This case will be submitted to you upon special issues, which is to say that I will hereinafter propound to you certain questions which you will answer as you may find from evidence, upon a separate sheet of paper which will be furnished to you. And for your guidance in answering such questions, I first give you the following instructions: The undisputed proof is that the plaintiff was a passenger upon a freight train of the defendant company, riding upon a drover's pass which entitled him to transportation upon that train from Houston to Liberty, and as such passenger, the defendant owed to him that high degree of care which a very cautious and prudent person would exercise under the same or similar circumstances,

to protect such passenger from injury, and failure to use such care by defendant would be negligence; however, because of his contract with defendant, the defendant was not required to stop or start its train or caboose at or from depots or platforms, or to furnish lights for the accommodation or safety of plaintiff.

"The term 'proximate cause,' in law, means that which, in a natural and continuous sequence, unbroken by any new and independent cause, produces the event, and without which the event would not have happened, and the result must be such as a person of ordinary prudence would probably have foreseen as likely to occur.

"And by the term 'contributory negligence' is meant such an act or omission on the part of the party injured which amounts to a want of that degree of care which an ordinarily careful and prudent person would use under the same or similar circumstances, which negligence concurs or co-operates with some negligent act of the defendant in causing injury to such person.

"The burden of proof is on the plaintiff to establish the material allegations in his petition by a preponderance of the evidence, and by the term 'preponderance of the evidence' is meant the greater weight of credible testimony; however, the burden of proving plaintiff guilty of contributory negligence is on the defendant, but upon such issue you may take into consideration all of the facts and circumstances in the case, whether offered by plaintiff or defendant.

"And you are the sole and exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given to the testimony.

"Now, keeping in mind the above instructions, I submit to you, for your answer thereto, the following question, to wit:

"Question No. 1. Did the defendant exercise that degree of care it owed plaintiff to afford him a reasonable opportunity to board the caboose of the train before it left Houston? (Answer 'Yes,' or 'No.') (Jury's answer, 'No.')

"Question No. 2. Was the plaintiff cursed, or were oaths used towards him by the conductor before the plaintiff boarded the caboose at Houston? (Answer 'Yes' or 'No.') (Jury's answer, 'Yes.')

"Question No. 3. If you have answered 'No' to the foregoing question No. 1, and if you have answered 'Yes' to the foregoing question No. 2, then find, and state in your answer to this question, what amount in money will fairly and justly compensate plaintiff for the injuries, if any, which you may find he sustained, which were directly and proximately caused by defendant's negligence, if any, or the cursing and oaths used towards him by the conductor, if any, and in arriving at this amount of money you may take into consideration the physical and mental suffering, if any, caused by such injuries, if any, which may include the shame, humiliation, or distress of mind, if any, that you may believe from the evidence was suffered by plaintiff, provided you further find that such cursing or language, if any, that the conductor spoke to or used towards plaintiff, was of a nature reasonably calculated, under the circumstances, to produce shame, humiliation, and distress of mind to plaintiff. (Jury's answer, '$333.')

"Question No. 4. Did the defendant, on the arrival of the train at Liberty, use that degree of care it owed plaintiff to stop the train at Liberty so as to afford him a reasonable opportunity, and a reasonably safe place for getting off of the caboose on which he was riding? (Answer 'Yes' or 'No.') (Jury's answer, 'No.')

"Question No. 5. As the train was passing through Liberty and proceeded towards Ames, did the conductor or brakeman curse plaintiff or use oaths towards him? (Answer 'Yes' or 'No.') (Jury's answer, 'Yes.')

"Question No. 6. If you have answered 'No' to

the foregoing question No. 4, and also have answered 'Yes' to the foregoing question No. 5, then find, and state in your answer to this question, what amount in money will fairly and justly compensate plaintiff for the shame, humiliation, and distress of mind, if any, that was caused him by such cursing or oaths, if any, provided that you further find that such cursing or oaths, if any, that the conductor spoke or used towards plaintiff, was of a nature reasonably calculated to, under the circumstances, produce shame, humiliation, or distress of mind to plaintiff. (Jury's answer, '$1.')

"Question No. 7. Did the plaintiff jump from the caboose while it was in motion, after the train had passed Liberty and was nearing Ames, because urged and persuaded to jump from said caboose by the conductor and brakeman, if they did so urge and persuade him? (Answer 'Yes' or 'No.') (Jury's answer, 'Yes.')

"Question No. 8. If you have answered 'Yes' to the preceding question No. 7, then was it negligent for the said conductor and brakeman to urge and persuade plaintiff to jump from the caboose? (Answer 'Yes' or 'No.') (Jury's answer, 'Yes.')

"Question No. 9. Was the plaintiff guilty of contributory negligence in jumping from said caboose? (Answer 'Yes' or 'No.') (Jury's answer, 'No.')

"Question No. 10. If you have answered 'Yes' or 'No' to above questions Nos. 7 and 8, and also have answered 'No' to above question No. 9, then find, and state in your answer to this question, what amount in money will fairly and justly compensate plaintiff for the injuries, if any, which you may find he sustained, and which were directly and proximately caused by defendant's negligence, if any, and in arriving at this amount of money, you may take into consideration the physical and mental suffering, if any, caused by such injuries as the plaintiff suffered, if any. (Jury's answer, '$665.')

"And at the request of counsel for defendant, the court also submits to you this additional question, to wit:

"Question No. 11. Was the plaintiff guilty of contributory negligence in failing to get off the train when it stopped at Liberty? (Answer 'Yes' or 'No.') (Jury's answer, 'No.')"

Upon the answers of the jury, the court entered a judgment against the defendant, in favor of the plaintiff, for the sum of $999; whereupon defendant filed a motion for new trial, and, with permission of the court, filed its second amended motion for new trial, which was, on December 14, 1915, overruled, to which action of the court, defendant excepted and gave notice of appeal, and this cause is properly before this court for adjudication.

The first assignment of error is predicated upon the alleged error of the court in failing and refusing to give the jury special charge No. 2, requested by the defendant, which charge was as follows:

"Gentlemen of the jury: You are instructed that you cannot allow the plaintiff anything by way of damages, if any, occurring to him, while at Houston, in going to defendant's caboose to get aboard the same."

The second assignment will be treated together with the first, the second assignment being as follows:

"The court erred, to the prejudice of the defendant, in submitting to the jury question No. 1, for the reason, as set forth in written objections to the main charge of the court, and also shown in paragraph 2 of said exceptions, said exceptions being as follows:

"'That the defendant excepts to the submission of question No. 1 to the jury, for the reason that under the evidence there is no issue to be submitted to the jury as to whether or not the plaintiff was afforded a reasonable opportunity to board the caboose of the train before it left Houston.'"

It will be noted that the first question propounded by the court is:

"Did the defendant exercise that degree of care it owed plaintiff to afford him a reasonable opportunity to board the caboose of the train before it left Houston?"

That question, together with the preceding charge, which told the jury that the defendant owed to the plaintiff that high degree of care which a very cautious and prudent person would exercise under the same or similar circumstances to protect the plaintiff from injury, and that the failure to use such care by defendant would be negligence, except, however, the fact that the defendant was not required to stop or start its train or caboose at or from depots or platforms, or to furnish lights for the accommodation or safety of the plaintiff, places the question squarely before us as to what degree of care, if any, the defendant company owed the plaintiff, who was at that time a passenger, in the eyes of the law, on the freight train of the defendant company.

In order that we may have a clear conception of the situation, it will perhaps be well to review the testimony. The plaintiff himself testified as to what occurred after he reached Houston, as follows:

"When I reached Houston I applied to the agent of the Texas & New Orleans for a drover's pass. The agent was in the office located out in the Fifth ward. I had never been there before. It was not the passenger station; it was the freight. There was a building out there on their switch which was right on the track. I then got my contract or pass from the agent, and inquired of him where the car was that the pass entitled me to ride in, and he told me. I was to come to Liberty in the caboose. In a short time the conductor walked in, and he pointed me out to the conductor and told him, 'There is a man that is going—' He pointed the conductor out to me and told the conductor, 'Here is the man that goes with that car of stock to Liberty.' The conductor got his papers there that he generally gets from the agent in fixing up the train, I suppose, and as he walked out of the door I followed him, and as he got out I asked him, 'Where will I get on the caboose; are you going to stop it here?' This was right in front of the station. The conductor said to me, 'No, by God, I am not;' and I said 'Where is the caboose?' and he said 'It is 36 cars below this engine standing here;' and I said 'Will you give me time to get there? I am sick and would love to get home, and will you give me time to get there?' and he said, 'It don't make a God damn bit of difference to me whether you get there fast enough to get there or not;' and he said, 'You can either take that chance or you can ride on a box car here, or you can follow the train out to the yards. I am going to do some switching out about a mile and a half;' and I told him that I was old and sick and I couldn't follow the train, and I couldn't ride on the box car; to please give me time to get to the caboose; and he said, 'It depends on how fast you can run or walk to get there. Don't make a damn bit of difference to me whether you get there at

all;' so I pulled out in the direction of the string of cars he showed me, for the purpose of getting on the caboose. The train was standing still at that time. When I first started to the caboose I had a light and went very fast to try to get to the train, and the light finally gave out and I got in a dark passage, which I took to be filled up with cars on both sides.

"After I started to the caboose, I suppose maybe there was 50 yards of passageway that I went over; I had a good light and went in a run, and then it became dark. There was two strings of box cars that I had to run down through to the caboose. I run and finally I fell, and fell over against a box car on the opposite side. The car I was going to take, the caboose, was on the left, and there was a string of cars over there, and I run over something and fell against the car and hurt my shoulder, and I went on, and tried to run and tried to walk, and I made it down there, and the train whistled when I reckon I was in two car lengths of the caboose, but I did not know how much further it was. At that time I thought I wouldn't get there, and would be left right in there in that place. And my feelings—the way I had been talked to—I was cursed; I was very much humiliated and mortified over it, and when I got to the caboose I was so weak, I couldn't hardly stand up. I was afraid that I would never reach the caboose in time and would be left there in that dark alley of a place, and I got about one box car between the caboose and me, and the train was moving, and it was moving when I caught hold of the guard, or whatever you call it, to go in the caboose, and the sweat was running off of me, and I never had such a feeling in my life. I taken out my watch and looked and it was 20 minutes after 12 o'clock. This caboose was the same caboose that had brought me to Liberty; and after I caught it the train proceeded on to Liberty."

[1, 2] We agree with appellant that the terms of the contract of carriage absolves the defendant from the ordinary obligations of defendant to the passenger of starting its caboose from the depot or platform, or from furnishing light for the accommodation or safety of passengers; but we do not agree, as we are unable to find any evidence which shows that the train upon which he was seeking to take passage in the caboose stood at the usual or customary place where trains of that character stood before starting, and within the freight yards of defendant at Houston. The testimony showed only, and that being of Brakeman Donahoe, that at the time they got the train made up at Houston the engine stands sometimes on the west side of Hardy street. The testimony only showing that the place where the train was, in which the plaintiff was trying to become a passenger in the yards at Houston, 36 car lengths from the engine at the head of the train.

[3-5] We also are inclined to accept the proposition that when one situated like the plaintiff in the instant case, who has accepted passage on a freight train, he accepts with the consequent inconvenience of traveling on a freight train; but it does not follow, because of the facts above stated, that the defendant did not owe to the plaintiff a duty with reference to giving to plaintiff a reasonable opportunity to board the caboose or train before it left Houston. We are inclined

to believe that the charge of the court, telling the jury that the defendant owed to plaintiff a high degree of care, which a very cautious and prudent man would exercise under the same or similar circumstances to protect such passenger from injury, was the true measure of care which the defendant owed to the plaintiff in giving him or affording him a reasonable opportunity to board the caboose of the train before it left Houston, and it therefore follows that in our opinion there was no error in the charge of the court with reference to the care required of the defendant; the jury having passed upon the question, and found that the defendant did not afford plaintiff a reasonable opportunity to board the caboose of the train before it left Houston, is conclusive so far as this court is concerned.

[6] We believe it was the duty of plaintiff in this case to present himself for passage at the defendant's caboose on the train wherever it might then be, but we are also of the opinion that time should have been given him in which to board the train, and that said train should have been required to wait until he had safely gotten aboard the same, or, in the event the trainmen could not give him a reasonable time to board the train, that he should have been instructed that there was not sufficient time for him to board the train, and should have been forwarded by another and later train. We do not hold that the train should have been unnecessarily delayed in order to permit plaintiff to become a passenger thereon, but he should have been informed that to wait a sufficient length of time for him to board the train safely would be to delay the train, but he would be forwarded by another and later train.

[7] We are of opinion that when the plaintiff obtained the drover's pass and walked out of the office where that pass was issued to him, preparatory to boarding the train, the locomotive of which was then standing near him, that he was a passenger, and that the defendant company became liable for the mortification and humiliation he endured because of the profane and abusive language, as found by the jury to have been used toward and about him at that time and place, the plaintiff not having provoked the offensive and insulting language to which he was subjected by the said conductor. The authorities are too numerous to mention, that one is a passenger when he obtains a ticket and is on railroad premises, preparatory to boarding a train, and are equally numerous holding that a carrier is liable to passengers if abused or molested by employés. We are of opinion that the degree of care required of the defendant company, as contained in the charge of the trial court, was not more onerous than was required under the law. We are aware that in the case of Ohio & M. Ry. Co. v. Brown, 46 Ill. App. 137, it was

held that a railway company which had issued a pass to a shipper of live stock to enable him to accompany the shipment and care for it, was held to be under no obligations to stop the train at a station, platform, or depot, upon which to enter the train, but that they refused to wait until he could safely get aboard the train, and refused to give him that information to which he was entitled under the circumstances.

After a careful consideration of these assignments, we are of opinion that there is no merit in either of them, and they are therefore overruled.

[8] The third assignment of error is that the answer of the jury to question No. 1 is unsupported by the evidence, and the evidence is insufficient to support the same, for the reason that under the contract with the defendant it was not required to stop its train at platforms or depots, nor to furnish lights, and the evidence, without dispute, shows that said caboose was stopped within 36 car lengths of said station at Houston, and within the yard limits at that place, and at a place that is usual to stop such trains at such time, and under such circumstances.

As has been noted already, there is no testimony that the place was the one where the train was usually stopped; but that matter has been gone over heretofore, and all the testimony from that standpoint has been set out. We have carefully considered the testimony, and we are of opinion that there was evidence to support the finding of the jury, and the assignment is therefore overruled.

By the fourth assignment, the action of the lower court is challenged, in that it was prejudice to the defendant in the court failing and refusing to give to the jury special charge No. 3, by defendant, which charge was as follows:

"Gentlemen of the jury: You are instructed that you cannot allow the plaintiff anything for any damages he may have suffered, if any, after leaving the station of Liberty."

The plaintiff testified as follows:

"The conductor told me it was going to stop in about a mile and a half to do some switching, and I taken the time when I got on the caboose, and when we got out to the switching it was just a 20-minute run. I observed just where he did the switching, and I have been out there and seen that place before; it seems to be about five miles; it is the Englewood switch. I have passed there since and noticed the distance. The yards are known as Englewood. I suppose it was about 40 minutes after 12; it come in the direction of Liberty. I was still in the caboose. The train reached Liberty, I suppose, about 4 o'clock in the morning. It made a stop somewhere on the road, between Houston and Liberty, but I don't remember where it was at. The train made a stop down at the railroad bridge, which is one mile from Liberty. The caboose was on the east side of the bridge when the train stopped, this was about 100 yards of this side of the trestle. It was then 4 or half after 4 o'clock, and it was very dark. I was in the caboose by myself; there was no one riding with me. I was riding in the caboose alone since we passed the little station, that is, some lights showed, and I thought at the time it was

Dayton, and the conductor come in and I said to him, 'Is this Dayton we are at;' and he said, 'By God, the next stop is yours;' and so I thought it was Dayton; but we come on and I recognized Dayton as we passed it afterwards, and this other stop that we come to, I didn't know where we was at—when the train stopped just off the east end of the bridge, I looked out—went to the back end of the car and looked all around to try to arrive at where we were, but I couldn't recognize anything. There is no railroad fence there, nor any sign of a station whatever. While we were there I did not locate where I was. After the train started I realized I was approaching Liberty when the train had run maybe 50 yards or more—the train had just stopped a very few minutes this side of the river trestle. None of the brakemen returned to the caboose before the train started; as the train started it proceeded east. I knew that we were reaching Liberty, because after the train had started, I suppose maybe 50 or 75 yards, I recognized a switch and a nigger house there that I know. The switch is about 150 yards, I suppose, this side of the river. It is nearly a mile from the settled portion of the town of Liberty. It is about three-quarters of a mile, I suppose, from the station and the streets in the town that are not fenced by the railroad right of way. I was by myself at the time I realized I was approaching Liberty by seeing the nigger house and the switch. After that the train picked up speed. I was just about the end of the fencing and about a quarter west of the depot when one of the trainmen returned to the caboose. I mean the railroad fence. I don't know what street is there, but it is on the street that Mr. Pickett, Sr., lives on; right there at that crossing. I think they call it the Pickett crossing. The brakeman come in at that point, that is, I taken him to be the brakeman, I asked him if he wasn't—I hadn't seen him before. I had seen only the conductor before. It was the brakeman that came in at that point.

"He was the first man I seen, and I asked him if they wasn't going to let me off at Liberty, and he said, 'No, by God, we ain't; why didn't you get off a while ago?' and I said, 'I didn't know where I was at; I knew I wasn't at Liberty;' and I said, 'I would be very glad if you would try to stop the train and let me off. I am sick, and my family is sick, and I would love to get off;' and I told him the stock on the train had been on the train two days without food, and, 'I have wrote I would be here this morning, and I know my family will be uneasy about me not getting off;' and he said, 'God damn, you are the most impudent man I ever had on the train with me to ask a train to stop and let you off;' and he said, 'You will be God damn certain to go to Nome, or jump off.' I plead with him a mile, I reckon, or maybe more than a mile.

"When I requested that he stop and permit me to get off he said, 'You are the God damnedest impudent man we ever had on this train to ask us to stop;' and he did not stop. I was standing on the steps, and the brakeman had told me to jump off, when the conductor come down climbing the ladder of the caboose, from the stop, and the conductor said to me, 'What in the hell are you doing here?' He said 'Get out of my way, God damn; what are you doing on these steps?' and I told him; and this other fellow, the brakeman, he said, 'I told him to get there and jump;' and I said, 'He has been trying to get me to jump off the train, and I am afraid; I never jumped off a train;' and he said, 'You will be God damn apt to jump off or go to Nome one;' that was the conductor; and he showed me how to place my feet, and how to jump. Well, he (the conductor) showed me how to place my feet on the steps, one ahead of the other, and told me to jump. I told him that I had never jumped off a running train; that

I was old, and that I was afraid to, and he said, 'The speed this train is going, any man ought to jump off it.' He said, 'No; it wouldn't hurt;' and I said I was afraid. I had a bundle with me. I had a sack with one thing and another in it, and the brakemen told me, 'I will throw your sack off when you get off.' The brakeman threw my sack off. He threw it off at about the same time I jumped off. After the conductor assured me that it wouldn't hurt me I jumped and fell. In jumping I tried to follow the instructions of the conductor. I finally consented to jump off by his telling and showing me the way he did. I thought probably I could make the jump without getting hurt. The train was still running; it must have been going 8 or 10 miles an hour. After the conductor showed me how to jump and assured me it wouldn't hurt, I jumped exactly like he told me, and I fell. I picked as smooth a place as I could to jump, and when I did fall I kinder run off down the embankment. The surface was a little flat next to the track where I jumped. There was an embankment of about two or three feet. As I hit the ground I rolled down the embankment; as I hit the ground I hit it kinder on my left side, my hands did, and it bruised my left hand and my knee here. It hurt my left knee. The worst hurt I got was right here in the side, and the side of my head was hurt. The conductor and the brakeman were both standing at the back end of the caboose. I think they hollered back to me to know whether I was hurt, and I told them I was. I remember they threw my bundle off just about the time I jumped. I found it there. I walked back to Liberty. It was about three miles away. It was just before daylight, and I reached Liberty just about daylight."

It will be noted that question No. 4 of the special issues was as follows:

"Did the defendant, on the arrival of the train at Liberty, use that degree of care it owed plaintiff to stop the train at Liberty, so as to afford him a reasonable opportunity, and a reasonably safe place for getting off of the caboose on which he was riding?"

To this question the jury answered, "No." Conductor Glazer testified:

"I remember the time I pulled a car of stock out of Houston to Liberty, being shipped by Mr. Tillman, on September 26th. There was a man in charge of the stock. The billing called for Mr. R. N. Tillman. I first saw Mr. Tillman that night after I left Englewood, which is about three miles this side of Houston. I don't know where Mr. Tillman got on that train. The car of stock was placed right next to the engine at Hardy street. I never had any conversation with Mr. Tillman before leaving Houston; never saw Mr. Tillman; didn't see anybody at all outside of the operator and bill clerk. I got my orders down at the lower office, and waybills up at Hardy street. The first conversation I had with Mr. Tillman was after we left Englewood; I asked him what he had to ride on. He told me he had a contract, and I asked him to let me see it, and he showed it to me. I was finding his right to be on the train. That night at Dayton he got right off ahead of me on the north side of the caboose on the rear, and asked how long I would be there, and I told him I didn't know; told him he had plenty of time. He did not ask me when we would reach his place; but I told him the next place would be his place and he said he knew it. I had no further conversation with him at Dayton. I left him and went to the head end to do my work, taking out some cars, and got some cars, and picked up a car of beer and ice, and brought it to the mercantile company, and placed it at the warehouse. When I left Dayton I rode on the head end of the train. After we left Dayton and reached Liberty, after we had stopped

at the first crossing the other side of the switch, not the crossing where the mileboard is 'One mile to drawbridge,' that is the west end of the yard, but at the first crossing; we stopped west of it; we cut out the car of horses and come down here and left the car on the main line, and switched in there and placed his car on the platform. It took 15 minutes to do that. Our train was stopped in the yard limits at Liberty. The caboose was in the yard limits; everything this side of the river is in the yard limits here. It is about 321 steps from the west point of the switch to the bridge. * * * Walking from the west end of the switch to Liberty was good; of course, it isn't a paved street; it was dirt walking; but it is as good walking as you will find. * * * The first time I saw Mr. Tillman after seeing him at Dayton was at Ames Hill, where I stepped on the caboose, this side of the caution block. It is about 75 or 80 cars this side of the west switch at Ames. This would be a little over a quarter of a mile this side of the hill. When we left Liberty after setting out the stock, I rode upon the head end of the train. I got from the head end by to the caboose by catching the hind end as it pulled by me coming up the hill. I got off the train at the head end. I was waiting for the train to hang up there so I could make a cut and double the hill. By hanging up we mean stalling on the hill. We had 73 cars on the train at that time, 31 loads and 43 empties. We were expecting to get stuck there. We did not get stuck, however; just did get over and that was all. We got down to a rate of speed at about one or two miles an hour. I had gotten off the train before that, on the head end, and waited until the back end came by me, and then I got on. That was the first time I saw him since leaving Dayton. I said to Mr. Tillman, 'Friend, I thought you got off at Liberty;' and he said it didn't make a stop, and I said it did stop; it had been there 30 minutes or more, because the engineer had taken water and went back and coupled up and worked around his engine, and it was fully 30 minutes there; and I told him I would take him to Ames and let him off there, or that I would take him to Nome. He did not ask me to stop the train. It was going very slow; a child could get off it; and I told him I would help him off the train if he wanted me to; would help him off like I would a baby. I did not at any time curse or use curse words to Mr. Tillman; don't make a practice of cursing anybody. I had no words of any kind with him. He said not a word to me, and I didn't say anything to him; he treated me very kind and I respected him the same; he asked me questions and I answered them. * * *

"The train was going about one or two miles an hour out at Ames Hill when I stepped back on it. It was just going up the top of the hill. * * * I didn't see Mr. Tillman at all until I left Englewood. I didn't know anybody was accompanying the car of stock until I left Englewood; until I got my bills; sometimes my bills tell me a man is in charge of stock. I can't say how far the station at Englewood is from the station that issued the drover's pass, because I don't know where Mr. Tillman got the pass. The agent gives it down at Liberty avenue. Mr. Gallagher's office is down at Liberty avenue. That is about four and a half miles from Englewood yards. * * * I don't make a habit of cussing people. I don't use profane language unless I am real mad. When it comes down to business, trainmen don't cuss nobody, they tell you 'Yes, sir,' and 'No, sir.' I can't account for anybody but myself. It is not my custom to cuss. If a fellow gets to asking me too many questions, I wouldn't get emphatic with him; I would tell him to go to hell. I told you that I might tell him to go to hell. I don't think I might tell him I didn't care whether he reached that caboose or not. I

did not tell Mr. Tillman to go to hell; I didn't see him until after I left Englewood. When I came back to the caboose, after we passed Liberty, I did not tell him, 'What in the hell are you doing here?' I asked him, 'What are you going to ride on?' and he said, 'I have a contract;' and I said, 'Let me see it, please;' and I copied it off onto my record. That is what I asked him at Englewood, the first time I saw him. I said, 'What are you traveling on?' He told me, and I said, 'Let me see it, please.' When I came down the caboose, I never come down on no ladder. He never seen me on no ladder unless on the head end at Ames. I said, 'Why didn't you get off at Liberty?' and he said, 'The train didn't stop;' and I said, 'Yes, sir, it did stop;' that is the very words I said to him; and I said, 'I will take you to Nome, or you can get off at the top of the hill.' The train didn't go half a car length from that point before he got off, because the train was slacking up the hill. We had that conversation and he had time to get down on the steps when we hadn't proceeded but half a car length. I said, 'Why didn't you get off at Liberty?' and he said, 'You didn't stop;' and I said, 'We did.' I told him I would stop at the top of the hill or take him to Nome. I told him I could do better than that; that I would help him off and save him walking about half a mile further back. The length of the caboose is about 40 feet. I told him that a child could get off. Mr. Tillman didn't make any reply to that that I know of. When I offered to get down and help him off, he didn't say a word, and I stayed in the caboose. He stepped off, I suppose. Mr. Smith is on the rear end; he is the rear man. I didn't see him jump off; I stayed in the caboose door. I don't know as anybody threw his bundle of pecans and stuff off. When he got off we had gone half a car length from the point where I boarded the caboose. Smith said something as he tumbled down the embankment, and I looked back and saw him on the ground. He was standing up. I happened to look back because Smith said something to me, and I come back to the door, and Mr. Tillman was on the south side of the track. We did not holloa and ask, 'Are you hurt?' That did not happen. The train was going about two miles an hour at the time he got off. As far as I know he didn't fall at all; he landed on his feet. I didn't know he was going to get off. I was going to take him to Nome. He could come back on No. 11 if he wanted to. I told him I could help him off there; I told him his horses had been placed to the platform and I could help him off. I told him that before I ever stepped on the caboose—I was on the steps. The train was jerking along. I told him his horses would be without water all day. I said I would take him to Nome. I said he could come back and look after his horses if he wanted to come back from Ames. I told him I would help him to get off. He didn't say anything about it, but I made up my mind to take him to Nome and let him come back on No. 11. When we stopped the engine that night, when we arrived at Liberty, before we did the switching, our engine was west of the sign which reads, 'Drawbridge one mile.'"

[9] We have rehearsed, perhaps, the larger part of the testimony with reference to the place where the train stopped at or near the town of Liberty, and the testimony does not show that it stopped at the usual and customary place for stopping such trains.

It is contended on the part of appellant that the defendant's train on which plaintiff was a passenger stopped at the usual place in the yards at Liberty, and at a place where plaintiff could have safely gotten off and walked to the station at Liberty, and that

plaintiff had been advised at Dayton, five miles west of Liberty, that the next stop would be his stop, and that, therefore, defendant had performed its obligations to plaintiff, and owed him no obligation, except not to willfully injure him.

The jury passed upon the testimony and, as before indicated, this court feels that it is bound thereby.

Complaint is made by the fifth assignment of error that the court erred to the prejudice of the defendant, in failing and refusing to give to the jury special charge No. 3a, requested by the defendant, which charge is as follows:

"Gentlemen of the jury: You are instructed that you cannot allow plaintiff any amount for damages, if any, suffered in trying to alight from said train near Ames Hill."

It is contended that it should have been given for the reason that, in attempting to get off at said time, plaintiff was guilty of contributory negligence as a matter of law, and that plaintiff's own evidence showed that he knew it was dangerous to get off the train moving at the rate of speed said train was moving at said time.

Plaintiff, as above set out, testified that they were trying to get him to jump off said train; that he told them he was afraid; he had never jumped off a moving train; and that the conductor said, "You will be God damn apt to jump off or to go to Nome." "The speed this train is going any man ought to be able to jump off." That he had a sack with him, and that the brakeman said they would throw his sack off to him; that they threw it off about the time he jumped.

[10] In our opinion, it cannot be said, as a matter of law, that plaintiff was guilty of contributory negligence in alighting, under the circumstances, from the moving train as it slowly climbed Ames Hill, but it was an issue raised by the testimony, and that issue was submitted to the jury as to whether plaintiff was guilty of contributory negligence at that time, and under the circumstances. Question No. 7 called the jury's attention to that. The question was:

"Did the plaintiff jump from the caboose while it was in motion, after the train had passed Liberty and was nearing Ames, because urged and persuaded to jump from said caboose by the conductor and brakeman, if they did so urge and persuade him?"

Question No. 8 was:

"If you have answered 'Yes' to the preceding question No. 7, then was it negligence for the said conductor and brakeman to urge and persuade plaintiff to jump from the caboose?"

Therefore, to our minds, the issue having been raised, and the testimony having been heard, and it being submitted directly to the jury, and they having passed upon the same, is conclusive, and in the light of the testimony, we cannot say they were wrong in their conclusion. Therefore, this assignment is overruled.

The sixth assignment challenges the action of the lower court in having committed er-

ror to the prejudice of the defendant in submitting to the jury question No. 7, for the reason set forth in paragraph 8 of the objections filed by the defendant for the court's main charge, which paragraph 8 is as follows:

"Defendant specially excepted to the submission of question No. 7, in that the undisputed evidence shows that at the time mentioned the defendant owed the plaintiff no duty except not to willfully injure him, and the undisputed facts do not raise the issue of plaintiff being willfully injured, nor is there any pleading to support the issue of his willful injury."

The seventh assignment is as follows:

"The answer of the jury to question No. 7 is unsupported by the evidence, and the evidence is insufficient to support said answer, in that the evidence shows that plaintiff had the option of going to Nome, a station some 15 miles east of the place where plaintiff attempted to alight from said train, or to get off at said station, and that the remarks of the trainmen of the plaintiff were in the nature of advice and instruction, and not by way of invitation or direction to alight."

[11] We are not prepared to say that question No. 7 was improperly submitted, or that the evidence is not sufficient to support the answer of the jury. The jury having found that the defendant company did not use that degree of care it owed plaintiff to afford him a reasonable opportunity to alight from the caboose at Liberty, and also that the plaintiff was not guilty of contributory negligence in failing to get off the train when the train was stopped, it seems to our mind that plaintiff remained a passenger on the train, and defendant company owed him the same degree of care that it owed him when he became a passenger. The assignment is therefore overruled.

The eighth and ninth assignments are as follows:

(a) "The court erred, to the prejudice of this defendant, in submitting to the jury question No. 8 for the reason set forth in paragraph 9 of the objections filed by the defendant to the court's main charge, which paragraph is as follows:

" 'The defendant excepts to issue No. 8 being submitted to the jury, for the reason that the undisputed evidence shows that the defendant owed the plaintiff no duty at said time, and for the further reason that plaintiff was guilty of contributory negligence.' "

(b) "That the answer of the jury to question No. 8 is unsupported by the evidence, and the evidence is insufficient to support said answer."

What has been said in passing on the last assignment applies equally here, and there is therefore, in our opinion, no merit in this assignment.

The tenth and eleventh assignments of error are as follows:

(a) "The court erred to the prejudice of this defendant, in submitting to the jury question No. 9, for the reason as set forth in paragraph 10 of the objections filed to the court's main charge, which paragraph is as follows:

" 'Defendant excepts to submission of question No. 9, for the reason that the evidence shows as a matter of law that the plaintiff was guilty of contributory negligence such as to defeat his right of recovery herein.' "

(b) "The answer of the jury to question No. 9 is unsupported by the evidence, and the evidence is insufficient to support said answer, in that the evidence shows that plaintiff knew it was dangerous to attempt to get off of said train, moving at the rate of speed that said train was moving at the time plaintiff undertook to alight therefrom at Ames Hill. It was further error, because, under the contract with plaintiff, the plaintiff had agreed to remain inside of the caboose while said train was in motion, and in attempting to get off at said time, the plaintiff did violence to said contract, and violated its terms in such manner as to be a complete bar to his right of recovery for injuries received in attempting to alight from said train at said time."

What has been said above, disposes of these assignments, and they are therefore overruled.

Complaint is made in the twelfth assignment of error that it was error in the court submitting to the jury question No. 4, for the reason set forth in its objections to the court's charge, that under the evidence there is no issue to be submitted to the jury as to whether or not the train was stopped at Liberty so as to afford him a reasonable time to alight.

The thirteenth assignment of error asserts that the answer of the jury to question No. 4 is unsupported by the evidence.

We have already passed upon the twelfth assignment, and we are not prepared to say that there was not sufficient evidence upon which to base the answer of the jury. Therefore these two assignments are overruled.

[12] By the fourteenth assignment of error, the action of the court is challenged, in that it is contended the answer of the jury to question No. 11 is unsupported by the evidence, and the evidence is insufficient to support the same. It will be sufficient in disposing of this assignment, to say that the evidence, in our opinion, justifies the answer, and the assignment is therefore overruled.

[13] The fifteenth assignment challenges the action of the court in having erred to the prejudice of the defendant in that portion of its main charge to the jury, wherein it instructed the jury that the defendant owed the plaintiff that high degree of care which a very cautious and prudent person would exercise under the same or similar circumstances, to protect such passenger from injury, and failure to use such care by the defendant would be negligence.

The proposition is that it was error, for the reason that it placed a more onerous duty upon the defendant company than that placed upon it by law, and it is contended that one traveling on a drover's contract and pass, for the purpose of enabling him to care for his stock in transit, is not, while accompanying his stock, entitled to all the rights and privileges of an ordinary passenger for hire, and that he assumes such risks and inconvenience as necessarily attend upon caring for such stock, and the riding of freight trains; otherwise than this, the liability of the railroad

company is that of a common carrier for hire.

The drover's pass, which is a contract entered into by and between plaintiff and defendant, specially stipulates the particulars in which the contract is different from that of an ordinary ticket purchased for transportation in passenger cars over the line. That is to say, it stipulates that the train shall not be required to stop or start its train or caboose at or from depots or platforms. It stipulates that they are not obligated to furnish lights for the accommodation or safety of such person. Aside from the stipulations above referred to in our judgment, the defendant owed the plaintiff that high degree of care which a very cautious and prudent person would exercise, under the same or similar circumstances, to protect such passenger from injuries, and a failure to use such care by the defendant would be negligence, and in our judgment, as heretofore stated, the status of the plaintiff had not ceased, as a passenger, and extended up to and including the time he alighted from defendant's train at Ames Hill.

By the sixteenth assignment, complaint is made that the court erred to the prejudice of defendant in failing and refusing to give to the jury special charge No. 7 requested by defendant, after special charges Nos. 1, 2, and 3a had been by the court refused, said charges being as follows:

"You are instructed that it was the duty of plaintiff, Tillman, to present himself for passage within such a time as not to cause any delay to the defendant company in the movement of its train, and, on the other hand, it was the duty of the defendant to afford plaintiff a reasonable opportunity to get aboard its train; but you are, in this connection, instructed that it was not necessary for the defendant to stop its train at depots or platforms."

What we have said heretofore in this opinion, covers the matter complained of in this assignment, and the same is in all things overruled. Also, the requested charge, so far as applicable, was included in the general charge.

The seventeenth assignment of error is to the effect that the court erred to the prejudice of defendant in failing and refusing to give to the jury special charge No. 5, as follows:

"Did the plaintiff, Tillman, know, or by the exercise of ordinary care should he have known, that it was dangerous for him to alight from the train at the time he attempted to alight therefrom? (Answer 'Yes' or 'No.')"

[14] The issue of contributory negligence was submitted to the jury, and a correct definition of the meaning of "contributory negligence" was given to them for their guidance. The verdict of the jury settled that issue, and to determine such question, the test is not whether plaintiff knew, or by the exercise of ordinary care should have known it was dangerous for him to alight from the train, for a decision of that fact would not decide that plaintiff was or was not guilty

197 S.W.—72

of contributory negligence; but it must be left to the jury to say if the act of plaintiff was or was not guilty of contributory negligence in jumping from the moving train, amounted to want of that degree of care which an ordinarily careful and prudent man would use under the same or similar circumstances. We see no error in the action of the court, and this assignment is overruled.

[15] Complaint is made by the eighteenth assignment that the jury's answer to question No. 3, allowing $333 as damages to plaintiff, is unsupported by the evidence, and the evidence as to the injury, as far as it conforms to the pleadings, is insufficient to support a judgment for that amount, and the answer shows that the jury' was controlled by passion, prejudice, or some other improper motive, rather than upon a deliberate consideration of the evidence. It is useless for us to comment upon the testimony, and a careful consideration of the record leads us to the conclusion that the testimony is sufficient to support the judgment, and there is nothing which tends to show that the answer of the jury was controlled by any improper motive. This assignment therefore is overruled.

[16] The nineteenth assignment is that the answer of the jury to question No. 10, allowing defendant in error $666 as damages for the injuries he sustained in attempting to alight from said train, is unsupported by the evidence, and the evidence is not sufficient to support said answer, and shows that the jury was controlled by passion, prejudice, or some other improper motive, and not by the evidence before it. Without commenting further upon the testimony, or setting the same out in full, we are of opinion that there is no merit in this assignment, and it is overruled.

It is urged in the brief of appellant that it is the duty of the caretaker of stock, or one riding on a drover's pass, to present himself for transportation in time, and at a place that will not in any way interfere with the ordinary operation of said train, and it is claimed that plaintiff did not do this, and had he come earlier to defendant's station, doubtless his alleged trouble at Houston would not have occurred. He would have had all the time he needed to go to plaintiff's caboose. Having waited until said train was about to leave before presenting himself for transportation, he therefore deprived himself of the right to go to said caboose in his own time, in his own way, and at his own convenience.

The record shows what really occurred, and that the plaintiff used as much dispatch as perhaps he could have done under any circumstances, judging from the time in which he arrived at Houston and the hour at which he went to the defendant's agent to get the drover's pass. In other words, it would have been, perhaps, impossible for the

plaintiff to have gone earlier to defendant's station; and in passing upon this question heretofore, we have distinctly stated that in our opinion he should have been given the information for which he asked, and should have been informed that the train was about to leave, and that he would not have time in which to take passage in the said caboose, and, under those circumstances, it was the duty of the defendant, if it would delay the dispatch of that train, to wait for the arrival of the caboose; that he should have been transported by a later train, or at any rate, he should have been given a reasonable time within which to get aboard the caboose before the train pulled out from Houston. The whole record reflects, if the testimony believed by the jury to be true was in fact true, that the defendant's agents, in their treatment of plaintiff, were harsh and abusive in their language; that their attitude, if not in fact hostile to the plaintiff, was that of a person who made no effort, either to give the plaintiff a reasonable time in which to board the train, or to stop at the place of his destination for a sufficient length of time, and in some way notify the plaintiff that he had arrived at the place of destination, and that upon finding that he had been carried beyond the place of his destination, in causing the plaintiff to leave the train in the way and manner in which the jury believed from the testimony did, in fact, occur.

We have examined this record carefully. In our minds there is no question of the justness of the verdict, the correctness of the charge, or the rulings of the court, and believing, therefore, that the defendant has had a fair and impartial trial, and its rights fully protected, the judgment of the lower court is in all things affirmed.

HIGHTOWER, C. J., did not sit in this case.

## On Motion for Rehearing.

BROOKE, J. In the original opinion, the following language was used (see page 1132), to wit:

"We agree with appellant that the terms of the contract of carrier absolves the defendant from the ordinary obligations of defendant to the passenger of starting its caboose from the depot or platform, or from furnishing light for the accommodation or safety of passengers."

We still adhere to the opinion so far, but the following language immediately is used:

"But we do not agree, as we are unable to find any evidence which shows that the train upon which he was seeking to take passage in the caboose stood at the usual or customary place where trains of that character stood before starting, and within the freight yards of Houston. The testimony showed only, and that being of Brakeman Donahoe, that at the time they got the train made up at Houston the engine stands sometimes on the west side of Hardy street."

The error was in quoting the testimony of the brakeman, Donahoe. His testimony was that, at the time they got the train made up at Houston, the engine stands "always," instead of the word "sometimes," on the west side of Hardy street. This testimony was incorrectly, as above stated, quoted in the original opinion. However, there was testimony that convinced the jury that the defendant did not exercise that degree of care it owed the plaintiff to afford him a reasonable opportunity to board the caboose of the train before it left Houston. As stated in the original opinion, the answer of the jury is binding upon the court, and we see no reason to call the same in question. We are only desirous that the testimony of the brakeman, Donahoe, should be correctly quoted, and that the plaintiff in error should have the full benefit of the finding that the said Donahoe did, in fact, so testify in the lower court, as shown by the record in this case.

Our attention is called to one other matter, as to where the train stopped in the yards at Liberty, and it is urged that the testimony of J. R. Glazer upon that proposition was as follows:

"After we left Dayton and reached Liberty, after we had stopped at the first crossing the other side of the switch (not the crossing where the mile board is 'One mile to drawbridge'; that is from west end of the yard), but at the first crossing, we stopped west of it; we cut out the car of horses and come down here and left the car on the main line, and switched in there and placed his car on the platform. It took 15 minutes to do that. Our train was stopped in the yard limits at Liberty. The caboose was in the yard limits; everything this side of the river is the yard limits here. It is about 321 steps from the west point of the switch to the bridge. You and I stepped it there to-day, it makes about 863 feet. The weather was good, pleasant weather at the time I hauled the car of stock. Walking from the west end of the switch to Liberty was good; of course, it isn't a paved street; it was dirt walking; but it is as good walking as you will find. There is a path between the railroad track from the point of the switch up to the crossing of the shell road here. The shell road crosses the railroad up close to the schoolhouse. The crossing is, I judge, about a quarter of a mile from the end of the switch. The first time I saw Mr. Tillman after seeing him at Dayton was at Ames Hill, where I stepped on the caboose, this side of the caution block. It is about 75 or 80 cars this side of the west switch at Ames. This would be a little over a quarter of a mile this side of the hill."

We have literally quoted the testimony of the said Glazer, with reference to the matters complained of. However, we have in no wise found it necessary to reach any other conclusion than the one arrived at in the original opinion. The court, however, desires that every litigant have the benefit of the testimony, as developed upon the trial of the case. The motion for rehearing is hereby overruled.